**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 13, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ALBERT LAWRENCE VAUGHAN,

Defendant - Appellant.

No. 10-3238

D. Kansas

(D.C. No. 5:05-CR-40157-JAR-1)

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY**, **ANDERSON**, and **HARTZ**, Circuit Judges.

---

## I.  Introduction

Albert Lawrence Vaughan was convicted of one count of bank robbery in violation of 18 U.S.C. § 2113(a) and (d) and one count of use of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A).  His convictions arose from the robbery of the First Bank of Kansas in Salina, Kansas, on October 15, 2004 (the "Salina robbery").  At trial, over Vaughan's objection, the district court allowed testimony concerning a prior bank robbery committed at the Bank

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

of Colorado in Grand Junction, Colorado, on October 2, 2004 (the "Grand Junction robbery"). The district court also admitted, again over Vaughan's objection, an apology letter Vaughan wrote after his arrest for the Salina robbery. Vaughan appeals, arguing both pieces of evidence were improperly admitted under Fed. R. Evid. 404(b). Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms**.

## II. Background

A. Salina and Grand Junction Robberies

On October 15, 2004, a man entered the First Bank of Kansas in Salina, Kansas, and approached the teller, Renee Ritten, demanding money. At the time of the robbery there were only four employees in the bank and no customers. After Ritten indicated she believed the man was joking, he pointed a handgun in her face and then fired a shot into a nearby filing cabinet. The robber demanded money from Ritten's first and second drawers and from her drive-thru teller's station. The robber wore rubber gloves and a "Starter 71" baseball cap with the bill of another cap configured so as to conceal most of his face. When he received the money, approximately $9,870, the robber stuffed it into his pants and fled on a bicycle. The four employees in the bank that day, Ritten, Carrianne Diederich, Leslie Hunley, and Michelle Lindeen, gave consistent descriptions of the robber—a white male in his 20s, around 5'8" to 5'9", weighing between 140–175 pounds, wearing a dark sweatshirt with light blue jeans, rubber gloves,

-2-

and the specially configured baseball cap. Of the four witnesses, only Lindeen identified Vaughan as the robber from a photo lineup and at trial.

Shortly after his arrest on June 29, 2005, Vaughan was interrogated by Special Agent Deen Abbott of the FBI. Vaughan was asked to confess to fourteen robberies at banks throughout Colorado, Nevada, Kansas, Utah, and Arizona between 2003 and 2005. Of those, Vaughan unequivocally confessed to nine robberies, denied one robbery, made no statement regarding one robbery, and gave equivocal answers regarding three robberies. In particular, Vaughan confessed to robbing "a bank in Grand Junction" on October 2, 2004, estimating that he took approximately $20,000.

At Vaughan's trial for the Salina robbery, the district court allowed testimony from the three employees who were working at the Bank of Colorado in Grand Junction on the day it was robbed as well as a police sergeant who investigated the robbery. The suspect in the Grand Junction robbery was described as a white male in his late 20s to early 30s, 5'8" to 5'10", wearing a "Starter 71" baseball cap with the bill of a second cap pulled down so as to conceal his face. The suspect wielded a handgun, demanded money from both the first and second drawer at the teller's station, stuffed the cash down the front of his pants, and left on a mountain bike.

Prior to trial, the government gave notice that it intended to introduce evidence of the Grand Junction robbery as well as twelve other robberies under

Fed. R. Evid. 404(b). Vaughan moved to exclude any evidence of the prior robberies, arguing such evidence was being offered to show propensity to commit robbery in violation of Rule 404(b). The district court granted the motion as to each robbery except for the Grand Junction robbery. The court concluded the Grand Junction robbery was sufficiently similar to the Salina robbery that evidence of the Grand Junction robbery was probative on the issue of the identity of the Salina bank robber.

B. Apology Letter

At the end of Vaughan's interview with Special Agent Abbott, he was given an opportunity to write an apology letter to the tellers of the banks he robbed. The letter read:

> I would like to take this opp[o]rtunity to apol[o]gize to you. I did not mean to scare you to this degree. I would like to say that you were never in any danger. I'm actually a very nice and thoughtful[] person and if I knew that this would have affected [you] the way it did, I would never of entered that bank. This makes me realize that I probably have scared a few other people, which I'm sorry about. I hope you can leave this experience in the past. I know that I will be trying.
>
> Once again I do feel bad and I'm very <u>sorry</u>.

At trial, Vaughan objected to the admission of the apology letter, arguing it would violate the court's 404(b) ruling because the letter referred to robberies other than the Grand Junction robbery. The government argued the letter was directed to the Grand Junction tellers and to all the tellers Vaughan admitted

-4-

robbing. The district court overruled Vaughan's objection and permitted the admission of the letter, instructing the government to go no further than stating the letter was directed to "the tellers." The jury returned a verdict of guilty on both counts of the indictment. Vaughan moved for a new trial, arguing the admission of the apology letter was erroneous under Rules 404(b) and 403. The district court denied the motion. Vaughan appeals, challenging both the district court's 404(b) order admitting evidence of the Grand Junction robbery and the admission of the apology letter.

## III. Discussion

### A. Grand Junction Robbery

#### 1. Standard of Review

The court reviews the admission of evidence under Fed. R. Evid. 404(b) for abuse of discretion. *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006). "An abuse of discretion occurs when a judicial determination is arbitrary, capricious or whimsical." *United States v. Shumway*, 112 F.3d 1413, 1419 (10th Cir. 1997) (quotation omitted). A district court does not abuse its discretion where its ruling "falls within the bounds of permissible choice in the circumstances." *Id.* (quotation omitted).

#### 2. Rule 404(b)

Under Rule 404(b), "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular

occasion the person acted in accordance with the character. . . . This evidence may be admissible for another purpose, such as proving . . . identity . . . ." To determine whether the admission of evidence under Rule 404(b) was proper, the court applies a four-part test derived from *Huddleston v. United States*, 485 U.S. 681, 691–92 (1988). The *Huddleston* test requires: "1) the evidence was offered for a proper purpose; 2) the evidence was relevant; 3) the trial court properly determined under Fed. R. Evid. 403 the probative value of similar-acts evidence was not substantially outweighed by its potential for unfair prejudice; and 4) the trial court gave the jury proper limiting instructions upon request." *Shumway*, 112 F.3d at 1419.

The fourth prong of the *Huddleston* test is not at issue: the trial court provided a limiting instruction at Vaughan's request. Nor is the first prong of the *Huddleston* test at issue. For Rule 404(b) evidence to be offered for a proper purpose, "[t]he Government must articulate precisely the evidentiary hypothesis by which a fact of consequence may be inferred from the evidence of other acts. In addition, the trial court must specifically identify the purpose for which such evidence is offered . . . ." *United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir. 1985). The government articulated several 404(b) purposes for which it sought to admit evidence of the prior robberies, including knowledge, motive, intent, preparation, plan, and identity. The district court rejected the first five of these but accepted the sixth. Vaughan denied any involvement in the Salina

robbery and so the government sought to establish identity by showing enough similarities between that robbery and the Grand Junction robbery to demonstrate a signature quality to both crimes. The court thus specifically identified the purpose for which evidence of the Grand Junction robbery was offered. While Vaughan contests the extent of the similarities between the Grand Junction and Salina robberies, these arguments are properly considered under the second and third *Huddleston* prongs.

### a. Relevance

Under the second prong of the *Huddleston* test, Rule 404(b) evidence is relevant if it "tends to prove or disprove one of the elements necessary to the charged offense." *United States v. Mares*, 441 F.3d 1152, 1156–57 (10th Cir. 2006). Uncharged prior bad acts can be used for a proper 404(b) purpose so long as they are "similar to the charged crime and sufficiently close in time." *United States v. Zamora*, 222 F.3d 756, 762 (10th Cir. 2000). "Moreover, although the uncharged crime must be similar to the charged offense, it need not be identical." *Id.* Where, as here, evidence is offered to show identity based on a *modus operandi* theory, the charged and uncharged acts must, "based on a totality of the comparison . . . share enough elements to constitute a 'signature quality.'" *Shumway*, 112 F.3d at 1420 (quotations omitted).

The court considers several non-exhaustive factors in considering whether the similarities between two crimes are sufficient to constitute a signature quality:

(1) geographic location (e.g. preference for rural or urban targets); (2) unusual quality of the crimes; (3) the skill necessary to commit the crimes; (4) use of a distinctive device; (5) geographical and temporal proximity between the crimes; (6) whether the crimes share similar physical elements; and (7) whether the crimes are part of a common scheme. *See id.* at 1420; *Mares*, 441 F.3d at 1158. Additionally, the district court has the discretion to consider these factors on a sliding scale such that "a few highly unique factors may constitute a 'signature,' while a number of lesser unique factors although insufficient to generate a strong inference of identity if considered separately, may be of significant probative value when considered together." *Shumway*, 112 F.3d at 1420 (quotations omitted).

Applying this standard, the district court determined the similarities between the Grand Junction and Salina robberies were sufficient to constitute a signature quality. The two robberies occurred in neighboring states and within thirteen days of one another. Witnesses gave a similar physical description of both robbers. Both robbers used a handgun, demanded "all the money," and instructed the bank tellers to search particular drawers for more money. Both robbers stored the money in the front of their pants rather than a bag or container, and both robbers used a bicycle to flee the scene. Most significantly, both robbers wore a "Starter 71" baseball cap which was specially rigged with the second bill of another baseball cap that the robbers used to cover their faces.

-8-

Vaughan argues most of the similarities between the two robberies are generic; robbers commonly use guns and escape by means of a bicycle[1], and Starter hats are sold in chain stores around the country. Vaughan also points to the dissimilarities between the two robberies: the Salina robber wore thin plastic gloves, whereas the Grand Junction robber did not. Further, the Grand Junction robber was polite and did not fire a gun, whereas the Salina robber was rude and did fire a gun. Finally, the Salina robber was described as having reddish-blond facial hair, whereas the Salina robber was not described as having facial hair. Vaughan also argues the district court's exclusion of the other twelve robberies he committed shows there was no signature quality to his robberies permitting an inference he committed the Salina robbery.

These arguments fail to demonstrate the district court's determination was arbitrary, capricious, or whimsical or that it fell outside the bounds of permissible choice under the circumstances. *Shumway*, 112 F.3d at 1419. To begin, Vaughan's attacks on the similarities between the two robberies are piecemeal. That is, he analyzes each of the similarities cited by the district court separately in an attempt to show each, standing alone, is insufficient to establish a signature

---

[1]In support of this contention, Vaughan cites several reported and unreported cases, as well as a plea agreement from a recent federal case in Kansas, involving robberies where the suspect used a bicycle as a means of escape. In its 404(b) order, the district court cited testimony from Special Agent Abbott indicating the use of a bicycle as a getaway vehicle in a bank robbery may occur as infrequently as five percent of all bank robberies.

quality. This approach is inconsistent with the course this court has taken in previous *modus operandi* cases, where the number and uniqueness of the factors necessary to establish a signature quality depends upon the particular circumstances of each case. *See id.* at 1420. Moreover, Vaughan's attempt to minimize the significance of the distinctive, double-billed, "Starter 71" cap used in each robbery is unpersuasive. The district court was well within its discretion to conclude two robberies, committed in neighboring states only thirteen days apart, in which the suspect used a specially configured cap with a particular insignia were likely committed by the same person.

While the dissimilarities Vaughan identifies—gloves, facial hair, politeness, and the discharge of a firearm—are relevant in comparing the two robberies, they are not so compelling as to demonstrate the district court abused its discretion in this case. Indeed, the case Vaughan cites as an example of where a court did abuse its discretion in admitting *modus operandi* evidence illustrates the type of showing he fails to make here. In *United States v. Myers*, 550 F.2d 1036, 1045–46 (5th Cir. 1977), not only were the similarities between the charged and uncharged robberies completely generic,[2] but there was a substantial

---

[2]The prosecution in *Myers* described the relevant "similarities" as follows:

> (1) both crimes were bank robberies, (2) perpetrated by [the defendants], (3) between two and three o'clock in the afternoon. In both robberies the victimized bank was (4) located on the outskirts of a town, (5) adjacent

(continued...)

dissimilarity between the two robberies. The charged robbery in *Myers* involved a lone gunman, whereas the uncharged robbery involved two armed suspects. *Id.* Finally, the district court's exclusion of evidence of the other robberies to which Vaughan confessed has no bearing on whether the Grand Junction robbery was sufficiently similar to the Salina robbery to establish a signature quality.

### b. Rule 403 Balancing Test

Under the third *Huddleston* factor, the district court must determine whether the probative value of the prior bad acts evidence used to show identity is substantially outweighed by the danger of unfair prejudice. *Mares*, 441 F.3d at 1159. "The exclusion of evidence under Rule 403 is an extraordinary remedy and should be used sparingly." *Id.* (quotation omitted). Here, in light of the previously-discussed similarities and close geographical and temporal proximity between the Grand Junction and Salina robberies, the probative value of the evidence was substantial. Moreover, Vaughan fails to show that the prejudice he suffered from the admission of this evidence was unfair. *See id.* ("While the

---

[2](...continued)
> to a major highway. In both robberies the participants (6) used a revolver, (7) furnished their own bag for carrying off the proceeds, and wore (8) gloves and (9) masks crudely fashioned from nylon stockings. Finally, (10), in one of the banks, two women employees were present; in the other, five women employees were present.

*United States v. Myers*, 550 F.2d 1036, 1046 (5th Cir. 1977).

evidence was 'prejudicial' to [the defendant] in the sense that it rebutted her theory of defense, such is the nature of evidence establishing an element of the charged crime.").

The evidence of the Grand Junction robbery was offered for a proper purpose, relevant, consistent with Rule 403, and submitted with an appropriate limiting instruction. The district court therefore did not abuse its discretion in admitting the evidence in Vaughan's trial for the Salina robbery.

B. Apology Letter

This court reviews the admission of the apology letter for abuse of discretion. *Id.* at 1156. The admission of 404(b) evidence is subject to harmless error analysis. *See United States v. Parker*, 553 F.3d 1309, 1316 (10th Cir. 2009). "A harmless error is one that does not have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to whether it had such effect." *Id.* (quotation omitted). Notwithstanding the deference owed to district court evidentiary rulings, after reviewing the record this court concludes the district court abused its discretion in admitting Vaughan's apology letter. Nonetheless, in light of the overwhelming evidence tending to establish Vaughan's guilt, the evidentiary error was harmless.

Under the third prong of the *Huddleston* test, even relevant evidence submitted for a proper 404(b) purpose should not be admitted if it fails the Rule 403 balancing test. *Mares*, 441 F.3d at 1159. Rule 403 provides: "The court may

exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." During the bench conference on Vaughan's objections to the admission of the apology letter, the parties disagreed over to whom the letter was addressed. The government proffered that the letter was addressed to the Grand Junction tellers and to all other tellers who worked at banks Vaughan admitted robbing. Vaughan argued the letter was addressed to tellers generally, including those involved in bank robberies the district court ruled were inadmissible under Rule 404(b). The district court allowed the apology letter to be admitted, but instructed the government not to go any further than saying the letter was written to "the tellers."

The apology letter, like the other evidence of the Grand Junction robbery, should have been admissible only to show the identity of the Salina robber through a *modus operandi* theory. Vaughan had confessed to the Grand Junction robbery, and the government presented substantial testimony, including accounts from three *modus operandi* witnesses, a Grand Junction police officer, and an FBI Agent, which developed similarities between the two robberies. The apology letter developed no such similarities. Its probative value was therefore minimal. The dangers of unfair prejudice, confusion of the issues, or misleading the jury, on the other hand, were substantial because of the possibility jurors would infer

the letter constituted a confession to the Salina robbery. Because the apology letter does not survive the Rule 403 balancing test under the third prong of the *Huddleston* test, it should not have been admitted.

Although the admission of the apology letter was error, this court has no grave doubt as to whether its admission had a substantial effect on the outcome of the trial. *See Parker*, 553 F.3d at 1316. The evidence presented against Vaughan at trial was overwhelming. It included four eyewitnesses who gave consistent descriptions of the Salina robber, one of whom identified Vaughan out of a photo lineup and at trial. Further, the admissible *modus operandi* evidence was highly persuasive as to the identity of the Salina robber. Even if the letter had not been admitted, the outcome likely would have been the same. Reversal on the basis of the admission of the apology letter is therefore inappropriate.

## IV. Conclusion

For the foregoing reasons, the court **AFFIRMS** the decision of the district court.

ENTERED FOR THE COURT

Michael R. Murphy
Circuit Judge